195 So. 755

**FIRST NAT. BANK OF BIRMINGHAM et al. v. HUDDLESTON.**

**6 Div. 579.**

Supreme Court of Alabama.

March 28, 1940.

Rehearing Denied May 9, 1940.

Cabaniss & Johnston and K. E. Cooper, all of Birmingham, for appellant.

A. Leo Oberdorfer, of Birmingham, for appellee.

FOSTER, Justice.

The question here involved is whether appellant, which we will call the bank, is liable to account for $838.37 as an asset of the Sun Creek Farms, a corporation, which we will call the corporation, and which it is claimed became insolvent, and that its assets became a trust fund, and are here sought to be marshalled and administered under section 7062, Code.

Under date of May 5, 1928, the corporation executed a mortgage on 4,000 acres of land in Alabama to John J. Kyser and Callie Kyser, which they transferred to appellee, George Huddleston, whom we will refer to as the mortgage creditor.

The corporation owned no other property of value, and it was organized, we infer, to own and handle the land embraced in the mortgage. The stock was owned by William N. Malone, his son Robert James Malone and, perhaps, other members of his family, who resided

in New York. The corporation then evidently through temporary officers executed the mortgage in question, which was a second mortgage for approximately $15,000, with the first mortgage of approximately $12,000, both of which came into the ownership of Mr. Huddleston, the mortgage creditor so designated by us in this opinion. Mr. W. N. Malone died May 9, 1930, and Robert James Malone was his executor, and the stock of the corporation came into the ownership of Robert James Malone and his wife, Virginia Malone.

Dated May 17, 1930, Robert James Malone and Virginia Malone, whom we will call the Malones, executed to the bank an agency agreement to act as attorney in fact for them with authority, among other things, to hold and manage the capital stock of the corporation, with power to collect the income from it and to vote it in person or by proxy. It also included real estate in Birmingham and in Mississippi. The bank as such agent undertook to handle said properties and continued to do so until March 31, 1933, when the land covered by the mortgages to the mortgage creditor was turned over to him, and the bank has had no further connection with it.

About the time when the agency agreement was executed there was an amount of interest past due to the mortgage creditor on the debt thus secured of $741.76. The bank required Mr. Malone to advance to it as a loan to the corporation $800 as a condition to its acceptance of the agency, out of which the above named amount was to be and was paid to the mortgage creditor.

In keeping its agency account with the Malones there was a general account No. 718, broken into three subsidiary accounts: 718-a showed separately the receipts and disbursements of the Birmingham properties; 718-b showed those of the Mississippi properties; 718-c showed those of the Sun Creek Farms. They were kept separately for information, the bank disbursed money as long as there was a balance when the three funds were computed together, sometimes showing an overdraft in one and a balance in the other sufficient to take up the overdraft and leave a net balance for disbursement. But no part of the corporation's funds were used except to pay the expense of operating the farms and other necessary expense, and the annual interest charges to the mortgage creditor. The net balance of all three accounts, as we interpret it, was the amount subject to distribution as the bank handled the situation. It was all the property of the Malones, as understood and treated by the bank, and when one of those subsidiary accounts showed an overdraft, it did not represent a debt due the bank by the Malones, if there was enough balance in the other subsidiary accounts to cover that overdraft.

Under the terms of the agency agreement it would have been available to the bank to have no subsidiary accounts at all, but to have only one showing receipts and disbursements from all sources. The mortgage creditor had no lien on the rents and income from the Sun Creek Farms land. The fact that the account with the Malones was broken up for information and convenience does not alter the legal status of the funds collected and disbursed by the bank. Legally it was but one fund, regardless of the bookkeeping arrangement, if all the subsidiary funds belonged to the Malones. On March 31, 1933, the status of the three accounts was as follows:

| | | | |
|---|---|---|---|
| 718-a | Birmingham properties balance of | $115.00 | |
| 718-b | Mississippi properties overdraft of | | $854.05 |
| 718-c | Sun Creek Farms balance of... | $838.37 | |
| | | $953.37 | |
| | | $854.05 | |
| | | $ 99.32. | |

So that on that day, considering the three subsidiary accounts as but a breaking down of one account, there was a credit balance to the Malones of $99.32.

We have no doubt of the correctness of this theory made on behalf of the bank, provided the receipts from those three sources were assets of the Malones.

But the Sun Creek Farms was a corporation whose stock was owned by the Malones, and was turned over to the bank under the agency agreement. Land of the Malones in this connection was not subject to this agreement, but only the corporate stock. True, the corporation was created to own and operate the land and was wholly owned by the Malones. But the corporate entity cannot be ignored. The receipts of the corporation did not belong to the Malones, but only

such dividends as were properly declared, unless the corporate existence is wholly ignored. If all parties should accept this view, the effect would be that the property and its income would belong to the Malones, and they would owe its debts. This is not the accepted view. They do not disregard the corporate identity and effect, and do not admit owing the mortgage debt.

■ The bank treats the debt as that of the corporation, but its theory is that its free assets are those of the Malones. So that the receipts and expenditures in connection with the Sun Creek Farms were transactions of the corporation, and not of the Malones, which status cannot be changed by bookkeeping arrangements. The corporation had not authorized an abdication of its entity, neither had its stockholders and creditors. The receipts and disbursements were of assets of the corporation, and not of the Malones, and must be treated in that light to determine the legal rights of the parties here involved. So that its moneys did not belong to the Malones, and were not subject to distribution as theirs. There had been no dividend declared, and the theory that the bank could treat its moneys as an integral part of the agency account of the Malones cannot be sustained. The agency of the bank was of the corporation, and not of the Malones insofar as its affairs were concerned, until its assets properly came into the ownership of the Malones.

■ We therefore must and will treat the affairs of the corporation as we would those of any other corporation. The bank became its alter ego, though not an officer of it.

■ We will for the present assume its insolvency on March 31, 1933, to which we will later refer. If insolvent, its assets were a trust fund under section 7062, Code.

Prior to this statute, this Court had first held that the trust fund theory existed (Corey v. Wadsworth, 99 Ala. 68, 11 So. 350, 23 L.R.A. 618, 42 Am.St.Rep. 29), and later overruled that holding that it did not exist. O'Bear Jewelry Co. v. Volfer, 106 Ala. 205, 17 So. 525, 28 L. R.A. 707, 54 Am.St.Rep. 31. The statute was said to make effective the principle of the first holding as in Corey v.

Wadsworth, supra. See City Bank & Trust Co. v. Leonard, 168 Ala. 404, 53 So. 71; Lowry v. Williams, 232 Ala. 386, 168 So. 436.

■ In Corey v. Wadsworth, supra, it is said that the directors and officers of an insolvent corporation cannot secure to themselves any preference over other creditors. This means also of course that the bank as its alter ego cannot prefer a stockholder who has a debt not otherwise preferred against the corporation. But as a creditor a stockholder is not relegated to an inferior status because he is a stockholder.

When the bank transferred the balance in the account of the Sun Creek Farms to what amounts to the personal agency credit of the Malones, it was not improperly appropriating the funds of that corporation to itself if it was not improper to apply them to the payment of the claim of the Malones as a creditor of the corporation. If we treat the transaction as the payment to the bank of an overdraft due it by the Malones, it was still a payment to the Malones in substance and effect. The right to do this, insofar as other creditors are concerned, depends upon whether there existed a right to pay the Malones in preference to this mortgage creditor.

If the Court holds that the bank is liable to account for the sum here in question, it would be so because it has paid it to or for the Malones through their agency account. The Malones would then be due to reimburse the bank or it could charge the amount back to them. They and not the bank are those on whom the burden of such a contingency would fall. They are therefore interested.

■■ This suit is in equity, where the court will not proceed unless all persons who are legally or equitably interested in the subject matter are parties to the suit. Silverstein v. First National Bank, 231 Ala. 565, 165 So. 827; Amann v. Burke, 237 Ala. 380, 186 So. 769; 65 Corpus Juris 1029. A final decree should not be rendered in the absence of necessary parties. Drath v. Armstrong, 224 Ala. 661, 141 So. 634.

We prefer at this time not to pass on the sufficiency of the evidence which it is claimed shows that the corporation was insolvent, when we consider that question

in the light of its meaning as defined in our cases. Corey v. Wadsworth, supra; Alabama Central R. Co. v. Stokes, 157 Ala. 202, 47 So. 336.

The Malones should be made parties so that they may controvert the question of insolvency of the corporation. They may also wish to contend that they are due to have a preference over the claim of this mortgage creditor to the extent that he was paid in February 1930 a sum of money out of an advance one of them made to the corporation to be used for that purpose, to be reimbursed out of the income to be derived from rents when received. They may wish to point out that during the period of the bank's agency, this mortgage creditor received all the net income of the corporation, though it had no lien on it. There were no receipts of income in 1933. On January 1, 1933, there was due this mortgage creditor $720, which was paid by the bank on January 24th. A few tax items were paid leaving a balance to its credit of $838.37, paid to the Malones.

Is this mortgage creditor in a better status in this respect than the Malones to whom payment was made of the amount of said balance on account of an advance they had made the corporation in anticipation of income out of which to pay the mortgage creditor in 1930? Should the same fund be used twice for his benefit in making equitable adjustments? It is probable that the Malones, if given a chance, would be desirous of making such contentions, though we do not now decide them. But they are directly involved, and since any liability decreed against the bank in this case would fall on the Malones they are indispensable parties here.

Reversed and remanded.

ANDERSON, C. J., and GARDNER and BOULDIN, JJ., concur.

On Rehearing.

FOSTER, Justice.
Application for rehearing overruled.

GARDNER, C. J., and THOMAS and BOULDIN, JJ., concur.